[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION CT Page 839
This is an action by the plaintiffs, owners of residential real estate against the defendant for breach of contract and claiming Unfair Trade Practices (C.G.S. 42-110b) in connection with a contract whereby the defendant agreed to purchase the residential real estate of the plaintiffs. The plaintiffs also sued Merrill Lynch Realty claiming that Merrill Lynch, as their agents, were negligent in the handling of this matter, and breached their contract with the plaintiff, and engaged in unfair and deceptive acts or practices in violation of the Connecticut Unfair Trade Practices Act (C.G.S. 42-110b).
The plaintiffs have settled their claims against Merrill Lynch Realty and hence the matter was not tried against Merrill Lynch Realty.
The defendant pleaded as a special defense that the plaintiff failed to provide the necessary water test results, preventing the closing and causing the defendant to lose his mortgage commitment. Further, that the square footage of the house was less than represented. And further, that the claim for damages would be limited to the liquidated damage provision limiting the amount of damages to the defendant's deposit.
By way of counterclaim the defendant claims money damages because of the failure of the plaintiff to furnish a water test, and further that the activity of the plaintiff constitutes a violation of CUTPA, C.G.S.42-110b.
The facts are as follows. The plaintiffs owned a home at 89 Highland Drive, Glastonbury. The plaintiffs gave to Merrill Lynch Realty a listing to sell the property. Shortly prior to July 28, 1988 the defendant met Wayne Merrick, a real estate agent employed by Merrill Lynch, who showed him many houses that Merrill Lynch, as agent, was offering to sell.
Wayne Merrick showed the defendant the house of the plaintiff on July 27, 1988. The defendant signed a real estate contract, on the Merrill Lynch Realty form, to CT Page 840 purchase the house for $456,200. The contract provided that Merrill Lynch was the sole real estate broker, the Listing Broker, and that no other broker brought the property to the Buyer's attention.
The contract called for a closing on or before October 1, 1988. The contract further provided a mortgage contingency clause of $365,000, Conventional Fixed Rate, 30 years, interest at Prevailing Rate and two points to be paid by buyer.
The contract contained a water test addendum contingency providing for a water test at Buyer's expense on or before August 15, 1988. The defendant obtained a mortgage commitment from First Federal Savings, dated August 12, 1988, in the amount of $365,000, requiring a closing on or before 45 days from that date, on or before September 26, 1988.
The commitment letter was further conditioned upon a "satisfactory well water analysis as to potability and E.D.E."
The Merrill Lynch agent, Wayne Merrick, was aware of the water test contingencies. Wayne Merrick arranged for the test, and selected a tester. The defendant, in expectation of the move from Somers to Glastonbury, enrolled his daughter in the Glastonbury school system and the Helyers drove her the considerable distance from Somers to the Glastonbury school every day so that the daughter would become acquainted with her new school and classmates in Glastonbury.
When the water test came back August 4, 1988, addressed to Mr. Merrick and Mr. Hellyer [Helyer], it showed "manganese exceeds desirable limits." The defendant paid the charge for this test, as he had originally agreed to do by the terms of the contract.
Rather than to abandon the contract, the defendant agreed to extend the closing to give the plaintiff the opportunity to correct the problem and to produce a satisfactory test report to comply with the contract and the mortgage commitment contingencies. The defendant was able to get the bank to agree to extend the commitment CT Page 841 date, and the defendant would take the consequence of 1/2% the increased interest rate. Meantime the plaintiff, who was in the process of buying a substitute home in Lebanon, asked to extend the closing date to the end of November so that the plaintiff could close on the house in Lebanon. To this the defendant agreed.
The plaintiff and the Merrill Lynch agent attempted to come to grips with the water problem. The plaintiff did some work on the water system. There is entered into evidence a report from a water analyses lab, directed solely to the plaintiff, which appears to contain a satisfactory result. The defendant has never seen that report, although he made numerous requests to be furnished the report.
The parties, after several delays in the closing date, set the closing for December 9, 1998 [1988], at the closing office of the bank. The closing was to be handled by Attorney Pontillo for the bank. The defendant and his wife and their attorney arrived at the bank at the closing time. The plaintiffs were not there, but their attorney was there with appropriate pre-signed documents.
The defendants had brought with them to the closing Bank Checks of Society for Savings and Connecticut Bank and Trust Company, and were prepared to close. The bank's attorney asked for the water report. The plaintiff's attorney called his office in Hartford from the Glastonbury closing office, less than ten miles away. He claimed that he was told the water test report was satisfactory and would be brought right over to the bank.
The parties waited for an hour and a half for the report to arrive. When it did not come, the bank's attorney stated that the closing would not take place that day for even if the claimed report arrived thereafter there was not sufficient time left for the bank to close. The bank's lawyer departed the closing. There being no closing, the defendants and their lawyer then left. Some time later the report arrived, as the plaintiff's lawyer had continued to wait. The report bore the date December 9, 1988, the date of the closing.
December 9 was the last day that the closing could CT Page 842 take place at that mortgage rate. The next day the bank was raising the rate. There is no indication as to whether the bank would rewrite the commitment at the new rate, and the defendant was not about to take still another increase in the mortgage rate.
The plaintiff's realtor, Merrill Lynch, still holds the $15,000 deposit. The contract calls for forfeiture of the deposit as liquidated damages in the event the plaintiff prevails in this action.
The law is clear concerning conditions necessary to require performance of a conditional contract. "If the condition is not fulfilled the right to enforce the contract does not come into existence." Feinberg v. Berglewicz, 32 Conn. App. 857, 860 (1993).
Mortgage contingencies in a contract for the purchase-sale of residential real estate are so common and frequent that the absence of such contingencies are the exception rather than the rule. In this era of grave environmental concern and intensification of governmental regulations to protect the public, banks impose stringent conditions upon their willingness to lend money for the purchase of property which may be diminished or obliterated in value by virtue of the existence of unsafe environmental or health conditions existing at particular properties.
In the instant case, not only was the necessity of a satisfactory water report a condition of the mortgage commitment, but the water test and report was a condition of the contract itself.
The mortgage commitment contained the following conditions: "Subject to a satisfactory well water analysis as to the potability and EDB." Without that reasonable condition being met there would be no mortgage.
Without a mortgage loan there would be no sale. Both buyer and seller were aware of that condition. Properly, the plaintiff does not contend that they were unaware of the condition of a proper water test report, or that said condition by the bank was irrational, frivolous or unenforceable. (Nor does the plaintiff contend that the water report condition of the contract is unenforceable). CT Page 843
The plaintiff contends that it was the buyer's obligation to secure and furnish the water test and report. The real estate contract does not state that. It states that the test and report shall be completed "at buyer's expense." The evidence clearly demonstrates that the first test and report was arranged for by the seller's agent, Merrill Lynch, and paid for by the buyer.
The contract does not contemplate that when the property fails the test the buyer shall be required to remedy the condition. Nor does it contemplate that the buyer shall be required time and again to pay for successive tests until the premises passes the test.
The law looks to the contemplation of the parties, by their activities, in interpreting the contract. See Lar-Rob Bus Corporation v. Fairfield, 170 Conn. 397,407, 408.
After the first test failed, Merrill Lynch arranged to have the successive test or tests performed and the report sent to the plaintiff. The defendant never received a copy of the report and was never asked by the seller to pay for the subsequent report. The defendant was informed by Elaine Driscoll, another staff member of the seller's agent, Merrill Lynch, that the defendant had no say in the subsequent test or tests and that the sellers would determine what method they chose to cure the problem, that their (seller's) obligation was to provide a water test that was satisfactory, and that they would do that.
The buyer was told, upon inquiry, that the subsequent test results showed compliance, that the water passed the test. The buyer asked for a copy of the test report a number of times. It was never produced, but they said they would have it or that they had it. Everyone knew that the water test report was necessary for the closing and for the mortgage loan. All that the buyer had to give to the bank was the water report which showed an unacceptably high manganese content.
The water report which was produced, after the closing had been terminated by the bank for failure of the production of the report, bears the date December 9, 1988, CT Page 844 the day of the closing, and is addressed to the plaintiff, Mr. Miceli. The court concludes that after the failure of the first test, the parties both understood that if there was to be a closing it would be the obligation of the seller, not the buyer, to correct the problem, and pay for the test, and that if the test result was not produced at the closing, there would be no mortgage, no closing, and no sale.
The buyer had already agreed to one mortgage and closing extension, which caused the mortgage note to go from 8.500% (Exhibit D) to 9.000% (Exhibit E). The court concludes that there was no obligation on the part of the buyer to seek an additional, mortgage commitment beyond the closing date, at additional application fees and increased mortgage rate, by virtue of the failure to produce the test result necessary to have the mortgage closing and the sale on that last day, December 12, 1988. The mortgage rate was already a half percentage over the previous rate of 8.5% at the time of signing of the contract, due to the delay in the seller solving the water problem and wishing to extend the closing date due to the seller's tardiness in closing the purchase of the substitute home in Lebanon, which was not a contract condition but was a matter of good will on the part of the buyer.
The plaintiff claims that the defendant wished to have a price reduction because of the long delay in closing, and because the house was less than the square footage represented by the plaintiffs, and that is why the closing did not take place. The court does not credit that contention. Although the buyer would have liked to have such reduction, and discussed the matter while the parties were waiting for the arrival of the report, which types of discussions are not uncommon at closings, the court credits the evidence that the buyers would have gone through with the closing at the contract price had the water report been produced. The fact that the defendant accepted the failure of the contract and thereafter sought substitute housing, and has not proved damages in this action does not alter that conclusion.
The court finds that the condition, the production of an acceptable water report, simply failed. The mortgage contingency failed and the contract contingency failed. CT Page 845 The failure of the contingency was not the fault of either party. Merrill Lynch assumed the role of selecting the tester and producing the test report. Their role appears to be more that of independent contractor, each of the parties looking to Merrill Lynch to produce the test report.
The court does not address the question of fault as concerns Merrill Lynch Realty. It appears clear that from the start both parties relied upon Merrill Lynch Realty to arrange for the tests and to produce the test report. Merrill Lynch Realty assumed the precarious role of being the agent for both parties, in the matter of the testing and report and this calls into question whether it was the agent for either party. That duplicate role is totally antagonistic to the concept of agency and the singular role which accompanies the obligators of agency. It is not the parties who failed each other, but the third party, Merrill Lynch, who failed them both. The claims against Merrill Lynch have been settled.
The court enters judgment for the defendant on the first and second count of the complaint. The third, fourth and fifth counts of the complaint against Merrill Lynch Realty have been withdrawn.
As to the defendant's counterclaim against plaintiffs, the court enters judgment for the plaintiff on the first count of the counterclaim and for the plaintiff on the second count of the counterclaim.
It is noted that both the plaintiff and the defendant had asserted as against each other, CUTPA, 665 42-110, claims in their respective counts. The court finds that even if applicable there was no violation of CUTPA by either party, and finds that the statutes CUTPA, C.G.S. 42-110 et al., are likely inapplicable to this single residential real estate transaction between the parties not so engaged in the business of real estate transactions.
Merrill Lynch Realty had asserted a cross-complaint against Garry C. Helyer for indemnification and costs, expenses and fees for defending the action brought by the plaintiff. It is not clear as to whether that claim has been finally withdrawn. If not, the evidence is clear, as CT Page 846 reflected by this judgment, supra, that Merrill Lynch could not prevail in its claim. Hence, the court enters judgment for the defendant, Garry Helyer, on the Merrill Lynch Realty cross-complaint against Garry Helyer.
The evidence demonstrates that fifteen thousand dollars has been furnished by the defendant and is held by Merrill Lynch Realty as the deposit. The court having adjudicated this matter, the court rules that the deposit being held by Merrill Lynch Realty, $15,000, be returned to the defendant.
L. Paul Sullivan, J.